Elizabeth A. Owen, Ph.D.
Clinical Psychologist
New York State License: 015406-1
125-10 Queens Boulevard #2301
Kew Gardens, NY 11415
eao8@tc.columbia.edu

## PSYCHOLOGICAL EVALAUTION

**Name of Defendant: Vernon Walker**

**Date of Birth: 2/11/1973**

**Date of Evaluation: January 26, 2019**

**Reason for Referral:**
Mr. Walker was referred to me for a psychological evaluation by his attorney, Mr. Di Chiara to assess for possible mitigation.

**Additional Sources of Information:**
- Psychiatric and Medical Records
- Legal Documents
  - Miranda Waiver dated 2/6/18
  - Indictment 18 CRIM 146 of 2/21/18
  - Repository Inquiry ("rap sheet")
  - Presentence Investigation Report of 11/26/18
  - Letter of Proffer Agreement of 8/14/18
  - Court transcript dated 10/3/18
- Collateral Contacts
  - Three cousins
  - Sister
  - Mother

**Confidentiality Waiver:**
Mr. Walker was informed prior to the evaluation that the usual doctor/patient relationship did not exist, that this was not a treatment relationship, and that the content of this evaluation was not wholly confidential. He was also informed that a report might be prepared and submitted to the court.

**Evaluation:**
The evaluation consisted of standard semi-structured interview, mental status, review of available records, psychological testing, and collateral contact with family members. On January 26, 2019 I interviewed Mr. Walker for 2 and ½ hours.

Bio-Psycho-Social History:

Mr. Walker states he was born in Brooklyn, named Laverne for a reason he does not know, and raised by "the state." By all accounts, his parents both used drugs, as did many adults in the extended family who often lived together, and Vernon's father was physically and emotionally abusive to his wife and the children in the home. One younger cousin recalls seeing Vernon's father throw his mother down stairs and describes a chaotic home where "love was present" alongside with drugs, but "not much parenting." Some were lucky enough to "get out." Vernon was not one of those. Here was a family home where people, adults and children, would come and go as they filtered through different institutions: jail, prison, group homes, foster care, etc. What is noteworthy is that whenever someone was released from custody, there was a place to stay. Adulthood brought some distance as people began having their own families, but there is still a strong sense of support when needed.

Both Vernon and his family report that he ate lead paint chips as a child, was tested and found to have lead poisoning. It is not clear whether he received treatment or not. It is well established that lead poisoning often leads to impacts on cognitive functioning (including working memory, pattern recognition, and ability to solve problems, among other skills), irritability and hyperactivity.

When he was 11 years old, Vernon's mother finally decided to leave her abusive common-law husband and she took her 2 daughters and Vernon to a shelter for battered women. This was a difficult time for him and he started acting out in such a manner that resulted in his having to leave the shelter and sent to group homes. The group homes were abysmal, and Vernon was physically and sexually abused by other children and staff members alike. Eventually he was placed in a foster home which seems to have been adequate in meeting his needs and providing a safer environment.

One cousin spoke of Vernon's past difficulty with substances and the law but stated "this (current legal) situation is sad because he wasn't the (instigator). It makes it even more disturbing and hurtful." I am informed that more than one family member is "beating themselves up" for the situation he is now in – especially as he was instrumental in raising his younger siblings and cousins when he was just a child himself. He himself is acutely aware of this: "I protected my mother from the harshness of the condition. I don't want her to feel guilty for putting me in the group home in the first place." To this day his family is unaware of the physical and sexual abuse he suffered while in the custody of the state (group homes, foster care and incarcerated).

More than one family member spoke about how Mr. Walker is a good father to his son. "He is a very loving father. His son is very smart – just as intellectual as his father. His son is the only thing on his mind. He loves his son, man."

Mr. Vernon reports numerous instances of loss of consciousness starting at the hand of his father when he was "8 or 9 years old." At age 10 he was hit by a car whereupon his father beat him for injuring his right leg. He has an indention on his left temporal lobe where he was hit with a

baseball hat while in a group home, was beat by officers while in Attica, and fell and suffered a head injury while at Valhalla.

He states he has been working towards his GED (has taken the exam several times but has not yet passed) but that recently those classes have been delayed. He appears to be of low average to average intelligence. Currently, he is reading Michelle Alexander's The New Jim Crow.

Employment history includes working as a laborer in construction as was a member of Afrobats, Inc., a performance group. He has not been able to get public assistance due to differences between the name on his birth certificate (Laverne) and the name on his Social Security card (Vernon).

He acknowledges a history of substance use, specifically marijuana and alcohol in addition to 2-3 suicide attempts overdosing on "crack and dope." He reports that he has been in substance abuse treatment, primarily during incarcerations, with good effect. These treatment programs also included mental health issues and medications for insomnia and anxiety. He has completed numerous programs while incarcerated including anger management, Step by Step, Focus Forward, and AA, to name a few. He was mandated to attend two treatment programs and hold down a job, requirements he was unable to adhere to due to scheduling difficulties.

In addition to being physically and sexually abused as a child, Mr. Walker reported he was raped on at least 2 occasions (possibly more as the pain made him "pass out" and he would sometimes "wake up with the stuff inside" on him) while an inmate in Attica which were severe enough to require two surgeries to his anus. (While men are less likely to be raped than women, they tend to have more physical injuries.) As Mr. Walker was talking about this, his voice became softer and unsteady and he rocked gently back and forth in a self-soothing manner. He was threatened with death if he told anyone about it and as far as he knows, the individual was brought up on criminal charges stemming from similar attacks on other inmates and found guilty. As a result of his trauma history, both in childhood and as an adult, he experiences anxiety attacks, phobias about public places, a highly sensitive startle response to being touched, and having flashbacks when seeing or smelling a man who reminds him of his father. While his childhood trauma was bad enough, the rape as an adult was worse, "because my manhood was taken," and because he would "walk around not knowing who knew about it. Every time someone looked at me I was thinking they knew." He had such shame about the rapes that he denied them even to the surgeon who operated on him. Medical records confirm that on 5/23/08 he has surgery under general anesthesia for "extensive anal and intraanal condyloma," a condition frequently associated with anal rape. Surgery is a treatment only for the most severe cases and even then is usually performed on an outpatient basis. Mr. Walker required a 4 day hospitalization.

Psychological Tests and Results:

Draw-a-Clock:
The Draw-a-Clock test is used as a quick screening for neuro-cognitive dysfunction. In it the individual is given a sheet of paper on which a large circle has been drawn and is instructed to "draw a clock." A relatively accurate drawing of the numbers and hands

suggests no gross neuropsychological deficits. However, inaccurate placements of the numbers or hands can reveal the possibility of a number of neurological impairments and indicates a need for additional testing.

The clock Mr. Walker drew had numbers somewhat misaligned and not evenly spaced. When asked to draw hands on the clock to indicate 10:15, he originally drew 10:45. He could see that it was incorrect but was unable to immediately correct it. Mr. Walker redrew the clock with the correct time and informed me that he always wears a digital watch although he does have an analog clock and was able to correctly read the clock on the wall of our room. In order to get a better sense of possible neuropsychological deficits (there were no indications of intellectual deficits), I administered the RBANS.

**Repeatable Battery for the Assessment of Neuropsychological Status (RBANS):** This is a screening measure designed to suggest possible deficits which would require additional assessment. See chart below for Mr. Walker's Index Scores and Functional level.

|  | Index Score | Functional Level |
|---|---|---|
| Total Scale | 72 | Borderline |
| Immediate Memory | 87 | Low Average |
| Visuospatial/ Constructional | 60 | Extremely Low |
| Language | 91 | Average |
| Attention | 75 | Borderline |
| Delayed Memory | 78 | Borderline |

As seen in the table above, Mr. Walker's overall neuropsychological functioning is in the borderline range indicating some significant deficits. Most notably, his visuospatial/ constructional performance was in the extremely low range which would account for his difficulty with the Draw-a-Clock test. Both Attention and Delayed memory deficits may well be the result of either/or lead poisoning or maternal prenatal substance use. Also important to note is his average score in Language. This innate intelligence has no doubt provided him with some internal resources as well as insight.

- PTSD Checklist for DSM-5 (PCL-5)

The PCL-5 is a 20-item questionnaire developed by Weathers, Litz, Keane, Palmieri, Marx & Schnurr for the National Center for PTSD – Behavioral Science Division in 2014 and is used by several branches of the U.S. military. It is a self-report measure that assesses the 20 DSM-5 symptoms of PTSD. The suggested cut-point scores for civilian primary care is 30-35. The cut-point scores for civilian specialty mental health clinic are 45-50.

Mr. Walker's total score is a 61. This includes questions designed to tap all of the DSM-5 criteria for PTSD: Intrusion, avoidance, negative alterations in cognitions and mood, and arousal and reactivity symptoms (APA, 2013, p. 2781-272). Mr. Walker exhibits sufficient criteria requirements of each of the symptom clusters to warrant a diagnosis of PTSD.

- Adverse Childhood Experience Questionnaire (ACE)
  The ACE measures 10 different types if childhood trauma; five are personal (trauma experienced by the patient) and five are related to other family members (trauma vicariously experienced). The Center for Disease Control published a study (Felitti, Anda, Nordenberg, Williamson, Spitz, Edwards, Koss & Marks; 1998) which showed links between childhood trauma and chronic physical diseases as well as social and emotional problems including being a victim of violence (including rape), suicide, and alcohol and drug abuse.

  Out of a possible high score of 10 (having had experienced all of the items on the scale), Mr. Walker endorsed 9. The one he did *not* endorse is consistent with what I have heard from him and his family, specifically that the family looked out for each other, felt close to and supported each other.

**Mental Status Examination:**
Mr. Walker is a 46-year-old married (but separated and in a relationship with another woman) black male, who appears his stated age. He is of average height and lanky with a long face punctuated with a black goatee and moustache which are shot through with grey. On both occasions he was alert, hypervigilant (he was startled when someone made a noise outside of our office and frequently and anxiously looked to the door) and fully cooperative. He was always appropriately dressed and groomed, and oriented to time, person, and place. His eye contact was good except for when the topic turned to the more recent of his sexual assaults. His mood was anxious, and his expression of affect was appropriate, congruent to mood and full ranging. Mr. Walker's speech was of normal rate, tone and volume with clear articulation. His thoughts were relevant, logical and well organized. There were no indications of psychosis (hallucinations, delusions, thought disorder, etc.). He defendant denied current thoughts of suicide and denies thoughts of homicide past and present.

**Forensic Considerations:**

Mr. Walker's early exposure to lead poisoning significantly negatively affected his neural development, resulting in long-lasting neuropsychological and emotional impairments. These include visuospatial-constructional, attention and delayed memory seen in his performance on the testing administered. It would also have caused, or at the very least, aggravated his Attention Deficit/Hyperactivity Disorder which, by all accounts, was never address or treated. In terms of behavior, damage to his frontal lobes, which govern executive functioning, impaired from an extremely early age his ability to plan, foresee consequences, and impulse regulation.

The physical, emotional and sexual abuse he suffered in his childhood, in addition to observing both parents addictions to substances, taught Vernon that adults in positions of authority, whether loved ones or not, could not be relied upon to provide safety and basic needs.   His inherited predisposition to addiction, along with observing those coping skills used by his parents – the only ones he could control and rely on for himself – led to a downward spiral of increasing reliance on substances as he tried to manage the sequela from the multiple traumas he endured.

It is not surprising then, as he was left untreated, that he entered institutions at an early age, many of these continuing and compounding the traumas he had already survived. Unfortunately, even these "refuges" which could have provided a safe, nurturing environment and taught adaptive coping skills, did neither. Follow this through to adulthood where institutions continued to "raise" him from a young adult to a man but did little identify, treat or provide guidance in his struggles with psychological traumas and dependence on substances – the only thing that provided a modicum of relief. Suicide attempts, documented by medical records, punctuated a desperate attempt to end his suffering when no reliable aid was forthcoming.

Unfortunately, while incarcerated, traumas he experienced as a child and had pushed to the background through denial and avoidance came rushing back when he was repeatedly violently sexually assaulted as an adult. The little he had of his own agency to protect himself, his sense of manhood, was destroyed. The lasting physical and psychological consequences remind him on a daily basis of his failings. Having, to some extent, given up on himself, he turned his focus on being the best father to his son that he could be, given the circumstances. He is fully aware that in many respects he is damaged beyond his ability to protect and nurture himself (and has never received the treatment which could – and still can – alleviate many of his symptoms) but has not given up on doing everything he can to protect and nurture his son.

There were many, many times in his life when Mr. Walker's trajectory could have been changed. The few times these were made available to him, they were insufficient and never examined the role of trauma in his life and functioning. Without addressing the root cause, the symptoms of substance abuse will likely remain as the only coping mechanism that has been somewhat effective. The fear and insecurity instilled as a child and compounded as an adult, drove anger and acting out, in an attempt to convince himself, and all those around him, that he is not as vulnerable as he feels. Could effective treatment in the past have addressed these issues successfully? Very likely so. Could effective treatment now make a difference in his current and future functioning? Without a doubt.

**Diagnosis:**
Posttraumatic-Stress Disorder

**Summary and Conclusion:**

Mr. Walker has struggled without his family's support with symptoms of PTSD due to several instances of being sexually assaulted and raped, especially the rapes he survived as an adult. This seems to be the one area which he felt uncomfortable being open with to his primary support group. This same sense of wanting to protect them from his trauma (and perceived failing as a man) fuels his life-long impulse to help his family in any way possible – including becoming involved in his most recent case. When called on by his cousin at the last minute, he perceived his cousin would not be safe and his instincts to protect his cousin kicked in. One could argue that he did not form an intent to conspire to commit a crime, rather his intent was to look after his cousin without thought to his own safety or well-being. His PTSD symptoms have significantly disruptive his daily functioning and render him afraid, somewhat paranoid, and irritable.

Trauma and neuropsychological deficits have made managing responsibilities difficult for Mr. Walker, despite his best intentions. It goes without saying that he has difficulty trusting others, especially those in positions of authority as both in and out of his home life he has consistently been let down if not put in physical and emotional danger.

Sincerely,

Elizabeth Owen, Ph.D.

Director, Queens FPECC
   Correctional Health Services
Adjunct Associate Professor, Clinical Psychology
   Columbia University/Teachers College
Adjunct Full Professor, Psychology
   St. John's University